IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No. 11-cv-00675-RPM

HANSON COLORADO FARMS PARTNERSHIP,

      Plaintiff,

v.

THOMAS JAMES VILSACK, Secretary of the United States Department of Agriculture;
ROGER KLURFELD, Director of the National Appeals Division of the United States
Department of Agriculture;
FEDERAL CROP INSURANCE CORPORATION, a Corporation within the United States
Department of Agriculture, and
WILLIAM J. MURPHY, Administrator of the Risk Management Agency,

      Defendants.

---

## MEMORANDUM OPINION AND ORDER

---

      Group Risk Income Protection (GRIP) is a federal crop insurance program operated by

the United States Department of Agriculture (USDA) under the authority of the Federal Crop

Insurance Act ("FCIA"), 7 U.S.C. §§ 1501 *et seq*. Hanson Colorado Farms ("Hanson CF" or

"the Plaintiff") is the named insured under a GRIP insurance policy for corn planted on 10,839.9

acres in Baca County, Colorado during the 2008 growing season. Hanson CF claimed a loss

under the policy after Baca County experienced a severe drought which significantly damaged

the county's 2008 corn crop. On March 12, 2010, the Risk Management Agency notified

Hanson CF that insurance coverage under its 2008 GRIP policy was denied. Hanson CF's

administrative appeal of that agency action was unsuccessful.

-1-

In this action, Hanson CF seeks judicial review of the USDA National Appeals Division Director Review Determination dated February 2, 2011, which concluded that Hanson CF did not have a bona fide insurable interest in the insured crop. Jurisdiction is provided by the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06 and 7 U.S.C. § 6999.

Crop insurance programs authorized by the FCIA are carried out by the Federal Crop Insurance Corporation (FCIC), a government-owned corporation, which acts as an agency of the USDA. 7 U.S.C. § 1503. The Office of Risk Management (Risk Management Agency or RMA) supervises the FCIC and oversees its programs. 7 U.S.C. §§ 6933(a), (b)(1)-(3); 7 C.F.R. § 400.701. Producers participating in Federal crop insurance programs may obtain insurance from "approved private insurance companies" (AIPs). 7 U.S.C. § 1502(b)(2); 7 C.F.R. § 400.701. The FCIC provides reinsurance to AIPs that insure producers under plans acceptable to the FCIC. 7 U.S.C. §§ 1508(a)(1) & (k).

The GRIP insurance program is designed to protect against widespread loss of revenue from a particular insured crop in a county. (*See* GRIP Basic Provisions, A.R. 001836).[1] Under a GRIP policy, the insured is indemnified if the county average per-acre revenue for the insured crop falls below the insured's "trigger revenue." The methods of determining the insured's

---

[1]Documents in the Administrative Record ("A.R.") have been Bates-stamped with a six digit number on each page. In this memo, references to the administrative record are designated by that number.

trigger revenue and the county average per-acre revenue are set forth in the GRIP Basic Provisions and other documents included in the policy.[2]

In January 2008, four married couples living in North Dakota formed Colorado Farms, a North Dakota general partnership, for the purpose of purchasing and farming land in Colorado, with the objective of eventually selling the land for profit. The eight individuals who formed the Colorado Farms partnership and their respective interests are Thomas Grabanski (16.6667%); Mari Grabanski (16.6667%); James Tallackson (16.6667%); Carol Tallackson (16.6667%); Brian Hanson (8.3333%); Ranell Hanson (8.3333%); Jeffrey Hanson (8.3333%), and Amanda Hanson (8.3333%). (A.R. 001928).

In February 2008, four of the Colorado Farms partners – Brian Hanson, Ranell Hanson, Jeffrey Hanson, and Amanda Hanson – formed a second North Dakota general partnership known as Hanson Colorado Farms (Hanson CF). (A.R. 001921). Brian and Jeffrey Hanson are brothers. They and their wives formed the Hanson CF partnership for the purpose of conducting farming operations on Colorado land acquired by the Colorado Farms partnership.

In early 2008, Colorado Farms began acquiring land in Baca County and Prowers County, Colorado. Tom Grabanski, one of the partners of Colorado Farms, had previous farming experience in North Dakota and Texas. The Hansons had no experience with farming or farm management.

---

[2]A GRIP policy consists of "the accepted application, [the GRIP] Basic Provisions, the Crop Provisions, the Special Provisions, other applicable amendments, endorsements or options, the actuarial documents for the insured agricultural commodity, and the applicable regulations published in 7 CFR chapter IV." (GRIP Basic Provisions, A.R. 001836).

Grabanski was acquainted with Paul McGeary (McGeary), an agronomist who provided services through a consulting company, Mac's Ag, Inc. McGeary was hired to assist with the Colorado farming business. Initially, McGeary advised Colorado Farms about land purchases and assisted in negotiations with sellers. Colorado Farms paid Mac's Ag, Inc. for McGeary's services.

On or about February 18, 2008, the partners of Colorado Farms and the partners of Hanson CF signed a written agreement entitled "Memorandum Lease," stating that Colorado Farms (identified as the Lessor) and Hanson CF (identified as the Operator) had mutually agreed that Hanson CF would farm land owned or leased by Colorado Farms in Baca County and Prowers County, Colorado, although the specific properties had not been identified. (A.R. 001651). The Memorandum Lease recited the following terms and conditions:

1.      Operator shall operate approximately 12,000 tillable acres in Baca County and Prowers County, Colorado. Said land shall be owned or leased by Lessor and assigned to Operator for the 2008 farm season. On or about April 1, 2008, an amendment shall be made hereto with a full description of the property to be included in this lease; and agreed to by all parties.

2.      Operator shall pay as rent for the premises the sum of $60.00 per tillable acre for dry land and $150.00 per tillable acre for irrigated land, due on or before December 1, 2008. The total rent shall be calculated and agreed to in an amendment by April 1, 2008. Operator shall reimburse Lessor for all irrigation expenses, including maintenance and utilities associated with the operation of the irrigation equipment.

3.      Operator shall covenant and agree to farm the premises according to the usual course of husbandry, performing all the work at the proper seasons and in the proper manner, and applying chemicals and fertilizers in compliance with all governmental regulations.

4.      All farm program payments shall inure to the benefit of the Operator for the 2008 season.

5.      This agreement shall not be assigned to another party without written permission.

6.      Operator shall return the premises at the completion of the lease in a condition similar to the condition at the beginning of the lease.

(A.R. 001651-53).

On March 13, 2008, Hanson CF submitted an application to NAU Country Insurance Company for GRIP insurance for 30,000 acres of corn to be planted in Baca County during the 2008 growing season. (A.R. 001877). Hanson CF stated on the application that it had a 100% interest in the crops to be insured. The insurance application was accepted.

On April 23, 2008,Colorado Farms and Hanson CF signed an "Amendment to Memorandum Lease," which amended the terms of the Memorandum Lease as follows:

The rent due shall be $660,000.00 for dry land (11,000 acres @ $40) and $225,000.00 for irrigated land (1,500 acres @ $150); for a total of $885,000.00 due by December 1, 2008. Irrigation expenses shall be due within 30 days of billing.

(A.R. 001654). A list attached to the Amendment identified specific parcels of land that were included in the lease. That list identified 10,016.90 dryland acres and 1,505.30 irrigated acres, located mostly in Baca County.

Between April 19, 2008 and June 2, 2008, corn was planted on Baca County real property identified in the Amendment to the Memorandum Lease. Colorado Farms paid all expenses associated with the planting.

McGeary managed the farming operations. He arranged for the purchase of seed, fertilizers, and herbicides. The sellers of those items billed Colorado Farms.

Farm labor was provided by custom farm workers who were hired and managed by McGeary. McGeary made arrangements for the farm workers to obtain and use equipment for the farming operations.

On or about June 23, 2008, Colorado Farms obtained a $3.5 million secured loan from Farm Credit Services, and Hanson CF obtained a $ 1 million operating loan from Farm Credit Services. (A.R. 001517-23). Hanson CF's $ 1 million loan was secured by the same property that secured Colorado Farms' $3.5 million loan. The partners of Colorado Farms (four of whom were also partners in Hanson CF) personally guaranteed both loans. (A.R. 001524-37).

The proceeds from Hanson CF's operating loan were used to reimburse Colorado Farms for expenses that Colorado Farms had paid for the planting and cultivation of the crop, such as fertilizer, seed, herbicides, equipment rental and labor. Hanson CF's $1 million line of credit was exhausted in July, 2008.

The partners of Hanson CF signed an undated guarantee agreement to Colorado Farms, which provided:

> Hanson Colorado Farms agrees to personally guarantee payment to Colorado Farms for all costs incurred by Colorado Farms for the 2008 corn crop for Hanson Colorado Farms.
>
> These costs include but are not limited to fertilizer, chemical and seed.
>
> Once the crop is harvested, Colorado Farm [sic] will determine the costs associated to Hanson Colorado Farms and invoice accordingly. Interest will accrue monthly until payment is received in full.

(A.R. 001576).

The GRIP basic policy provisions require the insured to submit an acreage report, identifying the insured's interest in all acreage on which the insured crop was planted in the

particular county. (GRIP Basic Provisions, A.R. 001837, 001841). On its acreage report dated July 14, 2008, Hanson CF reported that it had planted 10,839.9 acres of corn in Baca County between April 19, 2008 and June 2, 2008, and certified that it had a 100% (1.0) interest in the insured crop. (A.R. 001892-1901).[3]

As set forth above, Baca County experienced a severe drought in 2008, which significantly damaged the county's corn crop.

Grabanski arranged for sales of some irrigated corn grown on the acres identified on the acreage report. Proceeds from those sales were applied to expenses associated with growing and harvesting the crop.

The loss of revenue from Baca County corn production triggered the indemnity provision in Hanson CF's GRIP policy. On September 5, 2008, Hanson CF filed a Notice of Loss, certifying a production loss for corn grown on 10,839.9 acres.

The insurer (NAU Country Insurance Company) referred the claim to the RMA's Central Regional Compliance Office for review. The RMA participated in the insurer's investigation of Hanson CF's insurance claim. In connection with that investigation, the RMA reviewed documents provided by Hanson CF and Colorado Farms and reviewed Farm Credit Services's loan files for the two partnerships.  The RMA also interviewed Brian Hanson, Ranell Hanson, Jeff Hanson, Amanda Hanson, McGeary, Grabanski, personnel at two grain elevators, and Jennifer Tibert (Tibert). (*See* RMA letter dated March 12, 2010, A.R. 001804-32).

---

[3]The Acreage Reporting Date for 2008 Baca County corn was July 15, 2008. (Special Provisions of Insurance, A.R. 002432).

Tibert was an employee of Colorado Farms, who provided accounting and bookkeeping services for Colorado Farms, Hanson CF and other entities in which Grabanski had an ownership interest. On January 2, 2009, Tibert created an invoice identifying amounts that Hanson CF owed to Colorado Farms for expenses incurred in connection with growing and harvesting the Baca County corn. No interest rate was specified on the invoice.

When Hanson CF's $1 million loan from Farm Credit Services became due on November 1, 2008, Hanson CF had no funds to pay the debt. On January 22, 2009, the two Farm Credit Services loans were restructured as one loan, with Colorado Farms as the sole borrower. This restructuring relieved Hanson CF of its $ 1 million obligation to Farm Credit Services. (A.R. 001517).

In a letter dated March 12, 2010, the RMA notified Hanson CF that its entire insurance claim was denied for the following reasons:  (1) Hanson CF did not have an insurable interest in the insured crop; (2) Hanson CF failed to comply with section 10 of the GRIP Basic Provisions, which requires the insured to provide the USDA with access to the insured's records; (3) at the time the insurance attached, Hanson CF had no interest in certain acres on which the insured crop was planted, and (4) good farming practices had not been followed on certain acres. (A.R. 001804-32).

When the RMA determines that a producer failed to follow good farming practices (GFP), the producer has the right of judicial review without exhausting any administrative right to review. *See* 7 U.S.C. § 1508(a)(3)(B)(iii). On May 26, 2010, Hanson CF joined as a plaintiff in Civil Action No. 10-cv-00956-RPM, an action by seven producers who challenge the RMA's GFP determinations for their 2008 Baca County corn crops.

Hanson CF also challenged the RMA's denial of coverage by invoking the administrative appeal process set forth in 7 C.F.R. Part 11. That process involves a hearing before a USDA National Appeals Division (NAD) hearing officer and opportunity for review by the NAD Director.

The administrative hearing held on May 12-13, and 24, 2010, addressed the following issues:  (1) whether Hanson CF had complied with its contractual obligation to provide access to its records; (2) whether at the time the insurance attached, Hanson CF had control over all crops for which insurance was claimed; (3) whether Hanson CF had a bona fide insurable interest in the insured crop, and (4) whether the RMA properly applied its rules and regulations when reviewing Hanson CF's insurance claim? (A.R. 000287-97).

In an Appeal Determination dated June 24, 2010, the hearing officer upheld the RMA's denial of coverage. The hearing officer found that Hanson CF had complied with its obligation to provide access to records; that Hanson CF did not have control over 1,068.7 of the reported acres when the insurance attached, and that Hanson CF did not have a bona fide insurable interest in the insured crop. The hearing officer rejected Hanson CF's argument that the RMA had not violated its own rules and regulations. (A.R. 000292-97).

Hanson CF requested Director review of the hearing officer's determination that Hanson CF did not have a bona fide insurable interest in the insured crop. Hanson CF did not challenge the hearing officer's determination that Hanson CF lacked control over 1,068.7 of the reported acres when the insurance attached.

On February 2, 2011, the NAD Director upheld the Appeal Determination, finding that Hanson CF had failed to establish its bona fide insurable interest in the insured crop. (*Id.* 000393-410).

On March 17, 2011, Hanson CF filed this action, seeking declarations that the RMA's denial of coverage and the NAD Director Review Determination were not in accord with the governing statutes and regulations, were unsupported by substantial evidence, and were arbitrary and capricious. (Compl. at 9).

Under the APA, the court must "'hold unlawful and set aside agency [adjudicatory] action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] ... (E) unsupported by substantial evidence....'" *Rapp v. U.S. Dep't of Treasury*, 52 F.3d 1510, 1514-15 (10th Cir. 1995) (quoting 5 U.S.C. § 706(2) and *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413-14 (1971), *overruled on other grounds, Califano v. Sanders*, 430 U.S. 99, 105 (1977)).

"The duty of a court reviewing agency action under the 'arbitrary or capricious' standard is to ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Agency action is arbitrary and capricious if

> the agency has relied on factors which Congress has not intended for it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs.*, 463 U.S. at 43.

To determine whether the agency's decision is supported by substantial evidence, the court must "consider conflicts in the record and specifically define those facts which support the agency's decision. . . . This requires a plenary review of the record as it existed before the agency." *Rapp*, 52 F.3d at 1515 (citing *Olenhouse*, 42 F.3d at 1575-76).

"Evidence is substantial in the APA sense if it is enough to justify, if the trial were to a jury, a refusal to direct a verdict on a factual conclusion." *Rapp*, 52 F.3d at 1515; *Olenhouse,* 42 F.3d at 1575.

To be eligible for federal crop insurance, the insured must have a "bona fide insurable interest in a crop as an owner-operator, landlord, tenant, or sharecropper." 7 U.S.C. § 1520(2). That requirement is stated in the GRIP Basic Provisions, which include the following provision:

> To be eligible to participate in Group Risk Income Protection for any crop in any county, and to receive an indemnity thereunder, you [the insured] must have an insurable interest in an insured crop that is planted in the county shown on the approved application. The crop must be planted and harvested and be reported to us by the acreage reporting date. You may only purchase coverage under Group Risk Income Protection on your net acres of the insured crop.

(Grip Basic Provision, A.R. 001836).

The RMA's Loss Adjustment Manual ("the LAM Handbook") provides the following guidance regarding the definition of an insurable interest:

<u>Person Who Can Be Insured</u>

Only a person that has a bona fide interest in a crop at the time coverage begins, and that is not classified as ineligible can be insured. "*Bona fide interest*" means having a share of the crop (receives all or part of a crop) as an owner-operator, landlord, tenant, or sharecropper.

    (1)    Landlord

            Landlord is the owner of land upon which the crop is grown and who receives a share of a crop.

    (2)    Owner-operator, tenant, or sharecropper is a person who:

            (a)    Produces the crop.

            (b)    Exercises managerial control relating to producing and marketing the crop (controls what to plant, when to plant, when to till, cultivate, irrigate, fertilize, spray, harvest, market, etc.).

            (c)    Makes credit arrangements.

            (d)    Owns farming equipment, makes arrangements to obtain equipment, or hires custom work.

(LAM Handbook, Part 2, ¶ 12A, footnote omitted. (A.R. 002476)).[4]

The RMA interprets this handbook language to mean an owner-operator, tenant, or sharecropper who claims a 100% interest in the crop must engage in all four activities listed in Paragraph 12A(2) to have a bona fide insurable interest. Hanson CF disputes that interpretation, arguing that the factors listed in the Paragraph 12A(2) of the LAM Handbook must be read in the

---

[4]The GRIP Basic Provisions state, "We [the insurer] will use the procedures (handbooks, manuals, memoranda, and bulletins) as issued by FCIC and published on the RMA website at http://www.rma.usda.gov/ or a successor website, in the administration of this policy." (A.R. 001836).

disjunctive. The Defendants disagree, asserting that the RMA's interpretation is entitled to deference.

There is no logic to the RMA's contention that a person claiming a 100% interest in the insured crop must show that it engaged in all four activities listed in Paragraph 12(A)(2) to establish its bona fide insurable interest. The language of Paragraph 12A(2) does not support that interpretation. The listed activities are factors to be considered in the determination of whether the insured has an insurable interest, but the absence of any one of them does not defeat the insured's right to indemnification. The RMA's interpretation of that handbook language is not entitled to deference.

It is undisputed that McGeary managed the day-to-day farming operations for the crop planted on the acres identified on the acreage report. At the administrative hearing, Hanson CF argued that it produced the crop or exercised managerial control over its production through an employment relationship with McGeary. Hanson CF contended that McGeary was a shared employee of Hanson CF and Colorado Farms. Hanson CF presented evidence showing the rental terms stated in the Memorandum Lease, as amended, were above-market rates, and asserted that the lease rates were intended to compensate Colorado Farms for both the use of the land and other day-to-day expenses, including McGeary's farm management services.

In addition, Brian Hanson and McGeary testified regarding Hanson CF's relationship with McGeary. Brian Hanson said that he and his brother were responsible for the success of Hanson CF, and that Hanson CF had hired McGeary as its farm manager. McGeary testified that he worked for Hanson CF. McGeary said that he communicated with Jeff Hanson and received adequate directions on the farming decisions in Baca County. When asked who was responsible

for the 2008 Baca County corn crop, McGeary testified that Hanson CF was responsible.

D. Frank Plater testified as an expert for Hanson CF on the subject of related entities and shared employees. Plater said that it is common for related entities to share employees. He opined that the relationship among McGeary, Colorado Farms and Hanson CF was consistent with applicable law and practical experience, although he had never observed the use of elevated rent as compensation for a shared employee.

The Hearing Officer rejected Hanson CF's argument that it produced or managed production of the crop, finding the McGeary worked for Colorado Farms only. The Hearing Officer found and concluded:

> Based on the evidence presented, [Hanson CF] did not produce the corp [sic]. [Hanson CF] did not engage any personal labor, nor was it involved in the day-to-day farming activities. . . .
>
> [Hanson CF] has also not shown it exercised managerial control relating to producing and marketing the crop or that it made arrangements to obtain equipment or hire custom work. The evidence shows that [McGeary], acting in his capacity as an employee of [Colorado Farms], exercised managerial control relating to producing and marketing the crop. . . . [Colorado Farms] purchased the land used to produce the 2008 corn crops. . . . McGeary, acting as an agent for [Colorado Farms] hired, agreed to pay for, and oversaw the custom farm work used to plant, till, cultivate, irrigate, fertilize, spray, and harvest the corn crops planted for 2008. . . . Further, [McGeary], in conjunction with the hired custom farm workers exercised managerial control of what to plant and when to plant. . . . Finally, [Colorado Farms] marketed the corn crops [Hanson CF] insured. . . . [Hanson CF] did not directly engage in, or exercise managerial control over the activities listed in LAM Handbook (b) and (d).

(Appeal Determination, A.R. 000295-96). The Hearing Officer rejected Hanson CF's "shared employee" argument, stating:

-14-

>The evidence presented does not prove that [McGeary] was a shared employee nor does it prove that the elevated rent, if any, would be applied to [McGeary's] services. The rental agreement does not indicate the rent is for anything other than rent. . . . Also, [Hanson CF has not shown that [Colorado Farms] and [Hanson CF] agreed to share [McGeary's] time. . . . Further, [Hanson CF's] expert witness on interrelated companies said he has never seen elevated rent in lieu of specific wage payments for shared employees.

(*Id.* 000296).

In its request for Director Review, Hanson CF argued the Hearing Officer failed to consider the testimony of Hanson CF's witnesses, asserting that such testimony established that McGeary managed the farm operations on behalf of Hanson CF.

The Director rejected Hanson CF's argument, stating "[t]he record does not show that [Hanson CF] had sufficient control over [McGeary's] services in operating the farmland to establish that [Hanson CF] was [McGeary's] employer." (A.R. 000404). The Director acknowledged that McGeary had testified he worked for Hanson CF and had received some guidance from Hanson CF, but the Director concluded that testimony was outweighed by other testimony which showed that McGeary made all the major decisions. (*Id.* 000409). The Director concluded that even when McGeary's and Brian Hanson's testimony were credited, that testimony was "not sufficient to establish [Hanson CF] controlled [McGeary's] operation of the farmland." (*Id.* 00408-09). The Director found the testimony of the expert witness was not determinative "because it did not address the issue of [Hanson CF's] overall control over [McGeary]." (*Id.* 000409).

Hanson CF argues that the Director's determination is contrary to established agency law and not supported by substantial evidence.

-15-

The Defendants assert that Hanson CF's agency argument is not properly before this court, pointing out that during the administrative hearing Hanson CF argued that McGeary was its employee and did not contend that an agency relationship was established in any other manner. The Defendants argue that the administrative exhaustion requirement is fatal to Hanson CF's current agency argument.

The Defendants' argument is not persuasive. Hanson CF's shared employee or "borrowed servant" theory presented a question of agency law. Hanson CF addressed the law of agency in its Request for Director Review. (*See* A.R. 000320-21). The administrative exhaustion requirement has been satisfied.

"An agency is a 'fiduciary relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.'" *City & County of Denver v. Fey Concert Co.*, 960 P.2d 657, 660-61 (1998)(quoting Harold Gill Reuschlein & William A. Gregory, THE LAW OF AGENCY AND PARTNERSHIP § 2, at 4 (2d ed.1990)). "The essential characteristics of an agency relationship are that (1) the agent holds a power to alter legal relations between the principal and third persons and between the principal and the agent . . . ; (2) the agent is a fiduciary with respect to matters within the scope of agency . . . ; and, (3) the principal has the right to control the conduct of the agent with respect to matters entrusted to the agent . . . ." *Fey Concert Co.*, 960 P.2d at 669  (Hobbs, J. dissenting) (citing *Restatement (Second) of Agency* §§ 12-14 (1958). "Agency is ultimately a question of the intention of the parties and is evidenced by their acts . . . ." *Moses v. Diocese of Colorado*, 863 P.2d 310, 324 (Colo.1993).

-16-

Compensation is not an essential element of an agency relationship. That legal principle is not in dispute. Proof of an agency relationship does not require evidence that the principal extensively supervised the alleged agent's activities.

The Director's conclusions regarding the relationship between Hanson CF and McGeary, are contrary to established agency law and uncontroverted evidence. Brian Hanson's testimony showed that Hanson CF partners entrusted the farming operations to McGeary. McGeary's testimony that he worked on behalf of Hanson CF was uncontroverted. The existence of an agency relationship was established by that testimony. Thus, McGeary's farm management activities, including the hiring of custom workers and making provisions for the use of equipment, are attributable to Hanson CF, and Hanson CF produced the crop or exercised managerial control over production through its relationship with McGeary.

With respect to credit arrangements, the Hearing Officer found and concluded that Hanson CF had not made credit arrangements, stating:

> Based on the evidence presented, [Colorado Farms] made the credit arrangements for operating capital, debt payments, and wage agreements. . . . Vendors and hired workers held [Colorado Farms] responsible for payment of their services. . . . In addition, [Colorado Farms] bore the ultimate risk and responsibility for repayment of the money obtained to finance the 2008 corn crop farming efforts. . . . Although [Hanson CF] argues it made credit arrangements when if offered to repay [Colorado Farms'] for [Colorado Farms'] expenses, [Hanson CF] has not shown how an unspecified "personal guarantee" to reimburse a separate entity, who bore substantially all of the financial risks and managerial burdens in the farming effort, meets the definition of LAM(c).

(A.R. 000295).

The Director upheld the Hearing Officer's determination that Hanson CF had not made credit arrangements. (A.R. 000406-407). Without citing any authority, the Director interpreted "credit arrangements" within the context of USDA farm programs to mean "the producer bears

the risk of loss for producing the crop." (A.R. 000406).  The Director disregarded Hanson CF's $1 million loan from Farm Credit Services, concluding that Colorado Farms bore the risk of loss because Colorado Farms "absorbed [Hanson CF's] debt when repayment of its million dollar debt to FCS became due." (A.R. 000407). The Director also concluded that Hanson CF's agreement to repay Colorado Farms was not a "credit arrangement" because "[t]he undated guarantee Agreement and the invoice [Colorado Farms] compiled for [Hanson CF] were vague in omitting mention of interest and a repayment schedule. . . . " (*Id.*) The Director stated, "The documents do not refute that it was [Colorado Farms], not [Hanson CF], who bore the risk of the loss for the 2008 corn crop." (*Id.*)

Those conclusions run counter to the undisputed evidence that Hanson CF borrowed $1 million from Farm Credit Services, as evidenced by a promissory note and loan agreement dated June 23, 2008. From that date until the date the note was marked paid, Hanson CF was obligated for the indebtedness evidenced by the promissory note. The fact that the Hanson CF's $1 million loan and Colorado Farms' $3.5 million loan were cross-collateralized and secured by property of Colorado Farms does not signify that Hanson CF bore no financial risk for the $1 million promissory note. The restructuring of the debt and the creditor's subsequent release of Hanson CF's payment obligation does not alter the facts that Hanson CF entered into a loan agreement with Farm Credit Services, and those loan proceeds were used for production of the insured crop. The four partners of Hanson CF personally guaranteed the indebtedness to Farm Credit Services and remained liable as guarantors.

It is undisputed that Hanson CF still owes Colorado Farms approximately $1.2 million for expenses related to the farming operations. The Director apparently considered the written

agreement between Hanson CF and Colorado Farms regarding that debt to be an illusory obligation. There is no legal or factual basis for that conclusion. The obligation is not illusory merely because the written documents do not include specify an interest rate or repayment schedule. The agreement is not illusory merely because Colorado Farms and Hanson CF are related entities.

In sum, there is no legal or factual basis for the Director's conclusion that Hanson CF bore no financial risk for loss of the 2008 corn crop. The Director's determination that Hanson CF did not have bona fide interest in the insured crop was arbitrary and capricious and contrary to law.

With respect to the denial of coverage for 3,594.2 acres by application of the good farming practices exclusion which the Plaintiff originally challenged in Civil Action No. 10-cv-00956, the Plaintiff and Defendant FCIC entered into a stipulation for the severance of the Plaintiff's claim in Civil Action No. 10-cv-00956 and tolling of the applicable limitations period, pending resolution in this separate action of the question of the Plaintiff's bona fide insurable interest. Subsequently, the Plaintiff and the Defendants entered into a stipulation in this action agreeing to be bound by the final order on the merits in Civil Action No. 10-cv-00956-RPM, with respect to the GFP determination. (Stipulation, June 18, 2012, #31). For Hanson CF, the GFP issue is the planting of non-irrigated corn on newly broken ground without a fallow period. For the reasons set forth in this court's Memorandum Opinion and Order dated July 6, 2012, in Civil Action No-cv-000956-RPM, the RMA's denial of coverage for 3,594.2 of the Plaintiff's reported acres is affirmed.

Accordingly, it is

ORDERED that the USDA National Appeals Division Director Review Determination dated February 2, 2011 (Case No. 2010W000352), is vacated; and it is

FURTHER ORDERED that Defendant Federal Crop Insurance Corporation shall indemnify Plaintiff Hanson Colorado Farms Partnership pursuant to its GRIP insurance policy for 2008 Baca County corn, except that no indemnity is due for 3,594.2 acres which were excluded under the policy's good farming practices provision and no indemnity is due for 1,608.7 acres which were not under the Plaintiff's control when the insurance attached, as determined by the Appeal Determination dated June 24, 2010 (Case No. 2010W000352). It is

FURTHER ORDERED that costs shall be awarded to the Plaintiff upon the filing of a bill of costs pursuant to D.C.Colo.LCivR 54.1.

Dated: July 6, 2012

BY THE COURT:

s/Richard P. Matsch

_____

Richard P. Matsch, Senior District Judge